IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEROLD LIPSCOMB, | ) | |
| Plaintiff | ) | |
| v. | ) | No.   07 C 5509 |
| | ) | |
| OFFICER KNAPP, *et al.*, | ) | |
| Defendants. | ) | Judge Cole |

**OFFICER RAPACZ'S LOCAL RULE 56.1**
**STATEMENT OF FACTS**

Now comes defendant Officer Kevin Rapacz ("Rapacz"), by and through his attorneys, Odelson & Sterk, Ltd., and pursuant to Local Rule 56.1 hereby submits the following as his Statement of Uncontested Facts in support of his Motion for Summary Judgment:

**Nature of Action**

1.      On October 9, 2008, plaintiff Jerold Lipscomb filed a four-count Amended Complaint against defendants who were all members of the South Suburban Major Crimes Task Force.  Plaintiff raised claims for alleged deprivations of his civil rights pursuant to 42 U.S.C. §1983 and for various state law violations.  Count I is a federal claim for false arrest; count II is a federal claim for "unlawful duration of confinement"; count III is a state law claim for false arrest/false imprisonment; and count IV is a state law claim for malicious prosecution.  Plaintiff generally alleges that he was arrested on October 10, 2006, without probable cause and in violation of his rights.   (See Plaintiff's Amended Complaint, attached hereto as Rapacz Supplemental Exhibit A)[1]

---

[1] Rapacz refers to Defendants' Joint Submission of Deposition Transcripts and Exhibits as "(Def. Ex. __, p. __.)."
Rapacz refers to his supplemental exhibits as "(Rap. S. Ex. __, p. __.)."

**Parties**

2.      Defendant Kevin Rapacz at all relevant times was a detective employed in the Calumet City Police Department.  In October 2006, he was also assigned as an investigator to the South Suburban Major Crimes Task Force ("Task Force").  (Def. Ex. 3, pp. 6-7)

3.      Defendant John Daley was a member of the Burnham Police Department.  In October 2006, he was also assigned as an investigator to the Task Force.  (Def. Ex. 2, pp. 7-8)

4.      Defendant James Knapp was a member of the Markham Police Department.  In October 2006, he was also assigned as an investigator to the Task Force.  (Def. Ex. 1, p. 8)

5.      Former Defendant Christopher Laruea was a member of the South Holland Police Department.  In October 2006, he was also assigned as an investigator to the Task Force.  (Def. Ex. 4, pp. 5-6)

6.      Former Defendant Michael Cooke is a member of the Illinois State Police, and in October 2006 he was Commander of the Task Force and defendants' supervisor.  (Def. Ex. 5, p. 15)

7.      In October 2006, plaintiff was a resident of Hazel Crest, Illinois, where he lived with his great-grandfather Herman Lipscomb, Sr., his grandfather Herman Lipscomb, Jr., his grandmother Fannie Lipscomb; his uncle Robert Lipscomb, and his brother Darryl Lipscomb. They resided at 16973 Western Ave.  (Def. Ex. 7, pp. 6, 9)

8.      Prior to October 9, 2006, plaintiff was convicted of a felony drug-related charge and sentenced to four years in prison.  At the time of his arrest on October 10, 2006, he was on parole.  (Def. Ex. 7, p. 9; Rap. S. Ex. B, pp. 6-7)

2

9.    In October 2006, the Task Force was administratively divided into two teams (east and west sides). Each team was then subdivided into squads. The East Team was subdivided into north and south squads. (Def. Ex. 5, pp. 15-17)

10.    On October 9 and 10, 2006, defendants were members of the Task Force same team and squad. (Def. Ex. 5, p. 17)

## Venue and Jurisdiction

11.    Federal jurisdiction is invoked pursuant to 42 U.S.C. §1983 and the court's supplemental jurisdiction over the state law claims. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1334. (Rap.S.Ex. A)

12.    Venue is proper pursuant to 28 U.S.C. §1391 because the events giving rise to plaintiff's claims occurred in this judicial jurisdiction. (Rap.S.Ex. A)

## Task Force Investigation of Thomas Cook Murder

13.    In October 2006, the Task Force undertook the investigation of the murder of Officer Thomas Cook, a member of the Metra Police Department, in Harvey, Illinois, on or about September 27, 2006. (Def. Ex. 5, pp. 19-20, 23, 25)

14.    A Task Force team was activated and the investigation of the Cook murder was based out of the police department in Riverdale, Illinois. (Def. Ex. 5, p. 20)

15.    As part of the investigation, defendants obtained knowledge of various leads and became aware of persons who might have information relative to the murder of Cook. (Def. Ex. 3, p. 28)

16.    Prior to October 9, 2006, it became know to the Task Force and defendants that individuals named, or known as, Jemetric Nicholson and Lazeric Lipscomb, plaintiff's cousin, might have information relative to the murder of Cook. (Def. Ex. 3, p. 38; Def. Ex. 7, p. 7)

3

17.     The Task Force therefore became interested in locating and questioning Lazeric Lipscomb.  (Def. Ex. 3, pp. 28-29)

18.     At some point on October 9, 2006, defendants were assigned by the Task Force to locate and question Lazeric Lipscomb, and they were instructed to go to 16973 Western Ave, in Hazel Crest for that purpose.  (Def. Ex. 1, pp. 18-20; Def. Ex. 3, pp. 28-29; Def. Ex. 4, p. 15)

**Search for Lazeric Lipscomb at 16973 Western Ave.**

19.     On October 9, 2006, defendants were all on duty with the Task Force.   Around 3 pm to 3:30 pm, defendants left the Riverdale Police Department in two cars pursuant to their assignment.  (Def. Ex. 3, pp. 25, 30)

20.     Defendants arrived at the Lipscomb house at approximately 3:30 pm.  (Def. Ex. 1, p. 23; Def. Ex. 4, 16)

21.     Defendants were all wearing plain clothes with Task Force vests.  Defendants were also wearing their Task Force badges around their necks and other police equipment.  (Def. Ex. 3, p. 31; Def. Ex. 4, p. 18)

22.     Upon arriving at the Lipscomb house, most of the defendants, including Rapacz, approached the front porch and front door of the house.  At some point, Daley then went around to the rear of the house.  Rapacz remained near the front of the house.  (Def. Ex. 3, pp. 31-32)

23.     Rapacz and the officers in front of the house knocked on the front door, but there was no answer.  (Def. Ex. 1, p. 27-28; Def. Ex. 3, p. 32; Def. Ex. 4, p. 20)

24.     Shortly thereafter, defendants in the front of the house heard Daley announce that he had met someone in the back of the house.  (Def. Ex. 1, p. 30; Def. Ex. 3, p. 32)

4

25.     Rapacz stayed near the front door of the house.  Knapp and Lareau left the front of the house and met Daley who was with Herman Lipscomb, Sr. in the back of the house.  (Def. Ex. 1, p. 30; Def. Ex. 3, pp. 32-33; Def. Ex. 4, p. 22)

26.     Rapacz's fellow officers in the back of the house approached Herman Lipscomb, Sr., identified themselves as police officers, and asked about the location of Lazeric Lipscomb. Herman informed the officers that Lazeric had been at the house earlier in the day, but he was not certain whether Lazeric had returned or whether anyone else was inside the house.  (Def. Ex. 1, pp. 32-33; Def. Ex. 4, pp. 23, 28-29)

27.     Rapacz's fellow officers asked whether they could go inside the house to look for individuals. Herman agreed to allow them into the house.  Knapp went back to one of the Task Force vehicles and obtained a "consent to search" form.  He returned to the back of the house with it.  (Def. Ex. 1, p. 33; Def. Ex. 4, p. 31)

28.     Daley completed certain information on the form and presented it to Herman Lipscomb.  Herman looked at the form and then signed it.  Daley, Lareau, and Knapp all then took turns signing the form.  (Def. Ex. 1, pp. 36-37; Def. Ex. 4, pp. 26, 31, 33, and dep, ex. 3)

29.     It is the normal practice of the Task Force to use a consent form even when an owner or resident of the home voluntarily permits entry into the home.  (Def. Ex. 1, p. 35)

30.     Herman Lipscomb was very cooperative with respect to the officers' request to enter the house to look for individuals.  (Def. Ex. 1, pp. 34, 38; Def. Ex. 4, pp. 30, 34)

31.     Rapacz was not present for any of the conversation and interaction with Herman Lipscomb at the rear of the house.    (Def. Ex. 1, p. 34; Def. Ex. 3, p. 32-33)

32.     Rapacz could neither see nor hear his fellow officers interactions with Herman Lipscomb behind the house.  (Def. Ex. 3, pp. 32-33)

5

33.     Daley and Knapp then entered the house through the backdoor followed by Herman and then Lareau.  (Def. Ex. 4, p. 34)

34.     While Rapacz was still positioned at the front of the house, his fellow officers began to look for individuals in the house.  (Def. Ex. 1, pp. 69-70; Def. Ex. 3, pp. 36-37)

35.     Eventually someone opened the front door.  Rapacz remained in the front room of the house near the front door.  It was his intent to watch the front of the house.  (Def. Ex. 3, p. 36)

36.     This was the first time that Rapacz saw Herman Lipscomb and his fellow officers already in the house.  (Def. Ex. 3, p. 37)

37.     Rapacz was notified by a fellow officer that Herman Lipscomb had agreed to let the officers search the house.  (Def. Ex. 3, p. 34, 37)

38.     While Rapacz remained near the front entrance, the other officers walked through other portions of the house while Herman Lipscomb watched.  (Def. Ex. 1, pp. 69-70; Def. Ex. 3, p. 38; Def. Ex. 4, p. 50)

39.     Rapacz did not participate in the search of the house.  (Def. Ex. 1, pp. 69-70; Def. Ex. 3, pp. 25-26, 38; Def. Ex. 4, pp. 38, 50)

40.     Herman Lipscomb never made any objection to the officers' presence or activity in the house.  (Def. Ex. 3, pp. 38, 40-41; Def. Ex. 4, p. 36)

41.     While in sight of Herman Lipscomb, Rapacz never witnessed Herman make any objection to the officers' presence or activity in the house.  (Def. Ex. 3, pp. 38, 40-41)

42.     While near the front door, Rapacz heard one of the other officers (Daley or Knapp) announce from another room of the house that he had located a hand gun.  Daley entered

the other room while Herman Lipscomb watched. (Def. Ex. 1, pp. 51, 55; Def. Ex. 3, p. 39; Def. Ex. 4, p. 37)

43.     Knapp saw the butt of a gun sticking out from a mattress in a back bedroom as he was bending down to the floor to look for anyone hiding under the beds. (Def. Ex. 1, p. 45)

44.     Rapacz never entered or looked into the room where his fellow officers found the hand gun. (Def. Ex. 1, pp. 69-70; Def. Ex. 3, pp. 39-40)

45.     Rapacz did not see the room or location where his fellow officers located the hand gun and documents, and his knowledge of those facts was based entirely on what his fellow officers related to him. (Def. Ex. 1, pp. 69-70; Def. Ex. 3, pp. 39-40)

46.     The other officers emerged from the room with a hand gun and documents and secured them. (Def. Ex. 3, p. 41)

47.     Rapacz learned from Daley or Knapp that the hand gun was found sticking out from under a mattress of a bed in the other room and that a SWAP identification card and traffic ticket citation with the name "Jerold Lipscomb" were located with the hand gun. Rapacz also learned that the serial number on the hand gun had been altered or destroyed. (Def. Ex. 1, pp. 52-53; Def. Ex. 3, pp. 39-40, 47-48)

48.     Rapacz never personally held or examined the hand gun or documents discovered near it. (Def. Ex. 3, pp. 39, 49)

49.     The hand gun and documents identifying plaintiff remained in the possession of Rapacz's fellow officers as they were taken from the house. (Def. Ex. 1, pp. 54-55; Def. Ex. 3, p. 42)

50.     Herman Lipscomb stated that he had no knowledge regarding the presence of the hand gun in the house. (Def. Ex. 4, p. 43)

51.    A short time after they discovered the hand gun, defendants took the gun and documents and returned to the Riverdale Police Department. (Def. Ex. 3, pp. 42, 44)

### Arrest of Plaintiff on October 10, 2006

52.    It was a violation of Illinois law for anyone to possess a firearm with an altered serial number. (Def. Ex. 1, pp. 70-71; Def. Ex. 3, p. 46; Def. Ex. 4, p. 48)

53.    It was also a violation for anyone on parole to own or possess a handgun. (Def. Ex. 1, pp. 63-64; Def. Ex. 3, pp. 46, 83; Def. Ex. 4, p. 49)

54.    Rapacz was informed by someone with Task Force that plaintiff was on parole on October 9, 2006. (Def. Ex. 3, p. 51)

55.    Rapacz was not involved in the actual decision to arrest plaintiff. (Def. Ex. 3, p. 53)

56.    Rapacz believed that probable cause did exist to arrest plaintiff based on the presence of the hand gun with a damaged serial number having been found, with other identifying information, in plaintiff's bed while he was on parole. (Def. Ex. 3, pp. 46-47, 51-52)

57.    Plaintiff's status as a parolee and the presence of the hand gun and identifying information in his bed created sufficient probable cause to arrest or detain plaintiff. (Def. Ex. 1, pp. 64-65; Def. Ex. 3, pp. 46-47; Def. Ex. 4, p. 49)

58.    On October 10, 2006, defendants met in the morning at the Riverdale Police Department. At that time, Daley and Rapacz were given the assignment to return to 16973 Western Ave. in an effort to locate Lazeric Lipscomb and plaintiff. (Def. Ex. 3, pp. 52-53)

59.    Daley and Rapacz again drove a Task Force vehicle from the Riverdale Police Department to 6900 Western Ave. They were dressed similar to their dress the preceding day and wore Task Force vests and badges. (Def. Ex. 3, pp. 54-55)

8

60.    As they arrived at the Lipscomb house, they witnessed two individuals on the front porch of the house.  As they approached the house, one of the individuals remained on the porch and the other ran inside the house.  (Def. Ex. 3, pp. 56)

61.    Once again, Rapacz remained near the front of the house.  Rapacz never engaged in a chase of any individuals from the house, and he did not personally witness any chase by other officers.  (Def. Ex. 3, pp. 60-61)

62.    At some point, Rapacz was approached by a Hazel Crest police officer returning to the area of the Lipscomb house.  The Hazel Crest officer was leading plaintiff Jerold Lipscomb back to the house in handcuffs.  (Def. Ex. 3, pp. 56-57, 59, 61)

63.    The Hazel Crest officer stated that he had witnessed plaintiff run form the Lipscomb house and he chased, caught, and handcuffed plaintiff before turning him over to the Task Force officers.  (Def. Ex. 3, pp. 60-62)

64.    Rapcaz did not search plaintiff.  (Def. Ex. 3, p. 65)

65.    Plaintiff was placed in the back of the Task Force vehicle.  Daley and Rapacz then drove plaintiff back to the Riverdale Police Department.  They did not have any conversation or communication with plaintiff.  (Def. Ex. 3, pp. 65, 66)

66.    Upon arriving at the Riverdale Police Department, plaintiff was placed in the booking process.  Rapacz did not participate in the booking of plaintiff.  (Def. Ex. 3, p. 67)

67.    Rapacz did not complete any reports related to either the search or 16973 Western Ave. or plaintiff's arrest.  (Def. Ex. 3, p. 25)

68.    Plaintiff was arrested for unlawful possession of a firearm.  (Def. Ex. 3, p. 73)

9

**Interrogation of Plaintiff**

69.     Rapacz next saw plaintiff on October 10, 2006, following his arrest in an interrogation room with Daley at the Riverdale Police Department. (Def. Ex. 3, pp. 67-68)

70.     Plaintiff was questioned regarding Lazeric Lipscomb and an individual named Jemetric Nicholson (or "Meechie") who was believed to have information regarding the murder of Thomas Cook. (Def. Ex. 3, pp. 73, 84-85)

71.     Plaintiff also admitted to knowing about the hand gun discovered in his bed and having handled the gun. (Def. Ex. 3, pp. 82-83)

72.     Following the interrogation, plaintiff was returned to a holding cell at the Riverdale Police Department. (Def. Ex. 3)

73.     That was the last time that Rapacz saw plaintiff. (Def. Ex. 3, p. 86)

74.     Plaintiff stated at his deposition that he was interviewed by the same officers on additional occasions, including on October 11, 2006. (Def. Ex. 7, pp. 78-79)

75.     Rapacz never had any conversation or communication with an Assistant State's Attorney regarding the interrogation of plaintiff or regarding the filing of a criminal charge against him. (Def. Ex. 3, p. 89)

76.     Rapacz never consulted anyone regarding taking plaintiff for a court hearing. (Def. Ex. 3, pp. 72, 78, 86-89)

77.     Rapacz was not involved in plaintiff's case in any fashion after being present for an interrogation of him at the Riverdale Police Department. (Def. Ex. 3, p. 88)

78.     Rapacz never appeared in court to testify at any proceeding in which plaintiff was a defendant or called as a witness. Rapacz never transported plaintiff to any court or grand jury hearing. (Def. Ex. 3, pp. 88-89)

Respectfully submitted,

*/s/ Michael J. Hayes, Jr.*

_____

Officer Kevin Rapacz

Michael J. McGrath
Richard F. Bruen, Jr.
Michael J. Hayes, Jr.
ODELSON & STERK, LTD.
3318 West 95th Street
Evergreen Park, IL 60805
708-424-5678