**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEROLD LIPSCOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 07 C 5509 |
| | ) | |
| OFFICER KNAPP, OFFICER DALEY, | ) | |
| OFFICER LAREAU, OFFICER RAPACZ, | ) | Magistrate Judge Cole |
| and LIEUTENANT COOK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

On October 10, 2006, the plaintiff, Jerold Lipscomb was arrested for unlawful possession of a handgun. His arrest was the product of a murder investigation. The plaintiff was not a target in the murder investigation – his cousin, Lazeric Lipscomb, was – but when police searched a residence where they thought Lazeric lived, they found a handgun with the serial number altered. Lazeric never lived there; the plaintiff did, and purportedly, the handgun was found along with the plaintiff's ID and a few citations under a mattress in the home. Following his arrest, the plaintiff was interrogated regarding the murder for more than two days and taken to testify before a grand jury before he was finally taken for a probable cause hearing on October 13th. The charges against him were dismissed, because the gun was suppressed as evidence when the police officers' testimony regarding their search and discovery of the weapon was found to be "too coincidental." The bedroom and mattress where the gun was found were not even the plaintiff's.

The plaintiff has filed a lawsuit against the defendant police officers charging them with civil rights violations under 42 U.S.C. §1983. Counts I and II of his amended complaint allege false arrest

and unlawful duration of confinement. Counts III and IV are state law claims: false arrest/imprisonment and malicious prosecution. The plaintiff has since dropped his unlawful duration of confinement and malicious prosecution claims against Officer Knapp.

Officers Knapp and Rapacz have moved for summary judgment. As it turns out, the plaintiff seems to be one arrest no one wants to take credit for. Officer Knapp argues that he cannot be held liable because he was not there the day plaintiff was arrested, he was not on duty that day and had nothing to do with plaintiff's arrest. Officer Rapacz concedes he was there, but participated only marginally in the arrest. Even so, he argues that the arrest was grounded in probable cause. Alternatively, he claims he is entitled to qualified immunity because he reasonably believed that the arrest was based on probable cause. And he contends that they played no role in the plaintiff's subsequent confinement and prosecution.

## I.
## FACTS

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). The party opposing summary judgment must then respond to the movant's statement of proposed material facts. That response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." Local Rule 56.1(b)(3)(C); *Ciomber*,

527 F.3d at 643. District courts are " 'entitled to expect strict compliance' " with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does follow the Rule's instructions. *Ciomber*, 527 F.3d at 643; *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

On October 9, 2006, South Suburban Major Crimes Task Police Officers Knapp, Rapacz, Daley, and Lareau went to a single family home located at 16973 Western Avenue in Hazel Crest, Illinois. They were looking for Lazeric Lipscomb, whose name had surfaced in an investigation into the September 27, 2006 murder of Metra Police Officer, Tom Cook. (*Rapacz's Statement of Facts*, ¶ 16; *Plaintiff's Statement of Facts*, ¶ 1). The officers were understandably highly motivated to solve the case as the victim had been a fellow law enforcement officer. (*Plaintiff's Statement of Facts*, ¶ 3). For that reason, two task force teams, as well as numerous other police agencies, were working on the case. (*Plaintiff's Statement of Facts*, ¶ 2). Officer Knapp, a task force team leader, was supervising the team that went to the house in Hazel Crest. (*Plaintiff's Statement of Facts*, ¶ 39; *Knapp's Statement of Facts*, ¶ 7).

As it turned out, however, Lazeric Lipscomb never lived in that house; his cousin, the plaintiff, did, along with his great-grandfather, Herman, Sr.; grandfather; grandmother; uncle, Robert; and brother, Daryl. (*Plaintiff's Statement of Facts*, ¶¶ 1,5, 7). The plaintiff was never a suspect in the Metra police officer murder. (*Plaintiff's Statement of Facts*, ¶ 4).

When the officers arrived, three of them went to the front door of the house; Officer Daley went around to the back. (*Rapacz's Statement of Facts*, ¶ 22). There, Daley encountered plaintiff's grandfather, Herman, Sr., who was in the backyard with his dog. (*Plaintiff's Statement of Facts*, ¶ 6). Daley called the other officers back; Officer Rapacz remained at the front door of the house.

(*Rapacz's Statement of Facts,* ¶ 25). According to plaintiff, Officers Knapp, Daley, and Lareau

asked Herman, Sr., whether the "kid" was inside. (*Plaintiff's Statement of Facts*, ¶ 6). According

to Officers Knapp and Lareau, they specifically asked for Lazeric, and were told he was there earlier,

but might not be now. (*Rapacz's Statement of Facts,* ¶ 26). Herman, Sr., offered to go inside and

look, but the officers instructed him not to. (*Plaintiff's Statement of Facts*, ¶ 7).

As plaintiff describes it, Herman, Sr., then asked the officers if they had a search warrant.

They said they didn't, but warned him they could surround the home and prevent him from entering

or leaving. (*Plaintiff's Statement of Facts*, ¶ 8). So, Herman, Sr., went in through the back door with

one officer following, while the other two went in through the front door. (*Plaintiff's Statement of

Facts*, ¶ 9). He insists he never gave them permission to enter the house. (*Plaintiff's Statement of

Facts*, ¶ 10). The officers tell a completely different story. They maintain there was no question of

the need for a warrant, and that Herman, Sr., simply consented to a search of his home. (*Rapacz's

Statement of Facts,* ¶ 27). He even filled out a "consent to search" form that had been prepared by

Officer Daley. (*Rapacz's Statement of Facts,* ¶ 28). Plaintiff says that the officers had Herman, Sr.,

sign a form, but not until much later, after the conclusion of the afternoon's events and, allegedly

under false pretenses.

Officers Knapp and Daley then entered the house, followed by Herman, Sr., and Officer

Lareau. Officer Rapacz entered the front of the house. (*Rapacz Dep.*, at 35-37).[1] Once inside,

---

[1] Throughout their submissions, the defendants refer to their depositions as numbered exhibits. While they have provided deposition transcripts, none of them are numbered or tabbed, contrary to the requirements of Local Rule 5.2. This is not merely an inconsequential failure to comply with a local rule. Rule 5.2 was designed to allow judges ready access to the records on which they must rely in making decisions. The larger or more complicated the record, the more critical it is that Rule 5.2 be adhered to. Noncompliance makes it difficult to reference citations to the record, when, as the Seventh Circuit has
(continued...)

Herman, Sr., stood in the living room with Officers Lareau and Rapacz, while Officers Knapp and Daley searched the home. (*Plaintiff's Statement of Facts*, ¶ 11). They had searched for about 15 minutes when Officer Knapp called out to the other officers stating that he had found a gun in one of the bedrooms. (*Plaintiff's Statement of Facts*, ¶ 12). At the time, Officer Knapp thought the room was Lazeric's. (*Plaintiff's Statement of Facts*, ¶ 13; *Knapp's Responses*, ¶ 13). Daley and Lareau went toward the room to join him. (*Plaintiff's Statement of Facts*, ¶ 12).

There were three bedrooms in the house. Plaintiff shared one of them – one with two beds – with his uncle, Robert. (*Plaintiff's Statement of Facts*, ¶ 15). The room where Officer Knapp purportedly found the weapon had only one bed. (*Plaintiff's Statement of Facts*, ¶ 14; *Knapp Dep.*, at 44). Supposedly, Officer Knapp found the gun under the mattress along with some traffic citations issued to plaintiff and plaintiff's ID. Even after the events, he indicated in his notes that the room was that of Lazeric Lipscomb. (*Knapp Dep.*, Ex. 3). He says he was alerted to the gun when he got down on one knee to look under the bed; he saw the butt of the weapon protruding from under the mattress at the foot of the bed. (*Knapp Dep.*, at 44-45). Officer Daley recalls, somewhat differently, that Officer Knapp called out that he found a gun before he even entered the room; Daley saw him standing in the doorway of the room pointing at it. (*Daley Dep.*, at 71). Approximately 30% of the room was visible from the living room where Officer Rapacz was standing (*Plaintiff's Statement of Facts*, ¶ 16; *Lareau Dep.*, at 36-37). But Officer Rapacz says he didn't witness anything. (*Rapacz's Statement of Facts*, ¶¶ 44-45). Knapp and Daley told him where the gun was found, along

---

[1](...continued)
stressed, the goal should be to make it easier, not harder, for the judge to be able to rule in the party's favor. *LaFlamboy v. Landek*, 587 F.Supp.2d 914, 922 (N.D.Ill. 2008); *American Multi-Cinema, Inc. v. MCL REC, LLC*, 2008 WL 1744426, *1 n.1 (N.D.Ill. 2008).

with an ID card and a couple of traffic tickets bearing plaintiff's name. (*Rapacz's Statement of Facts*, ¶ 47). The gun had an altered serial number. Moreover, plaintiff was on parole after a four-year term of incarceration for a felony drug-related charge. (*Rapacz's Statement of Facts*, ¶ 8).

Because the officers all thought the gun was found in Lazeric's bedroom, the only thing connecting plaintiff to the weapon was the fact that it was conveniently found on top of plaintiff's ID and tickets. The plaintiff claims the weapon wasn't his, and that he kept these traffic citations and ID inside a drawer in the night stand that was next to his bed – in the other bedroom. (*Plaintiff's Statement of Facts*, ¶ 18). Herman, Sr., says he did not see the gun in the bedroom where it was purportedly found; he did not see it until one of the officers brought it out in a plastic bag and showed it to him. (*Plaintiff's Statement of Facts*, ¶ 19). He says he had never seen the gun before that, and didn't know anything about it. (*Plaintiff's Statement of Facts*, ¶ 19). Neither did the plaintiff's uncle, or his brother, (*Plaintiff's Statement of Facts*, ¶ 20-21), or grandfather. (*Plaintiff's Statement of Facts*, ¶ 22). Herman, Sr. also says that the officers showed him the gun, and told him he had to sign a form indicating they were taking it. (*Plaintiff's Statement of Facts*, ¶ 23). He couldn't read the form; at 97, he is blind in one eye and has had the other eye operated on, obscuring his vision in that one with a "red streak." (*Plaintiff's Statement of Facts*, ¶ 23).

The next day, October 10, 2006, Officers Rapacz and Daley went back to the Hazel Crest home and arrested the plaintiff, his uncle, and his brother. They may have been assigned to do so (*Daley Dep.*, at 100-101; *Rapacz Dep.*, at 52-53), although Officer Rapacz has testified that the decision to arrest plaintiff was Officer Daley's (*Rapacz Dep.*, at 72), apparently after he learned plaintiff was on parole. (*Rapacz's Statement of Facts*, ¶ 54). And his statement of facts indicates he was "assigned to return to [the house] in an effort to locate Lazeric Lipscomb and plaintiff."

6

(*Rapacz's Statement of Facts*, ¶ 58). Officer Knapp was not on task force duty that day. (*Knapp Statement of Facts*, ¶ 19). Once he briefed his superiors on what he found and where and signed the items into evidence, he had no further part in the story. (*Knapp Dep.*, at 54-56).

Officers Rapacz and Daley went back to the Hazel Crest home. Once they got there, Officer Rapacz says this is what happened:

> As they arrived at the Lipscomb house, they witnessed two individuals on the front porch of the house. As they approached the house one of the individuals remained on the porch and the other ran inside the house. Once again, [Officer] Rapacz remained near the front of the house. Rapacz never engaged in a chase of any individuals from the house, and he did not personally witness any chase by other officers. At some point, Rapacz was approached by a Hazel Crest police officer returning to the area of the Lipscomb house. The Hazel Crest officer was leading plaintiff Jerold Lipscomb back to the house in handcuffs. The Hazel Crest officer stated that he had witnessed plaintiff run from the Lipscomb house and he chased, caught, and handcuffed plaintiff before turning him over to the Task Force officers. Rapacz did not search plaintiff. Plaintiff was placed in the back of the Task Force vehicle. Daley and Rapacz then drove plaintiff back to the Riverdale Police Department. They did not have any conversation or communication with plaintiff.

(*Rapacz's Statement of Facts*, ¶ 60-65).

The plaintiff has a different take on what occurred:

> [Plaintiff] walked out of his home and Task Force officers were already on the scene, and he was handcuffed on the porch by Task Force police officers. When the officers came to the home, Robert was in the house, while Darryl and [plaintiff] were on the porch. Further, Darryl Lipscomb testified that both he and [plaintiff] were arrested on the porch of the home, after he saw the officers approach the home from the porch. . . . Further, [plaintiff] unequivocally testified that no Hazel Crest police officer participated in his arrest. . . . when the Plaintiff was handcuffed he asked why he was being arrested and he was told that they were going to take him for questioning.

(*Plaintiff's Response to Rapacz's Statement of Facts*, ¶ 60-65).

The officers transported the three to the Riverdale Police Department. (*Plaintiff's Statement of Facts*, ¶¶ 25-26). Plaintiff's uncle and brother were held for two or three days, and questioned regrading the Metra police officer homicide. (*Plaintiff's Statement of Facts*, ¶ 26). Neither one was

charged with anything. (*Plaintiff's Statement of Facts*, ¶ 26).

When plaintiff arrived at the Riverdale Police Department around noon, he went into the booking process. (*Rapacz's Statement of Facts*, ¶ 63). Officers Rapacz and Daley then placed him in an interrogation room. According to Officer Rapacz, they questioned him about the Metra police officer murder, specifically Lazeric Lipscomb and an individual named Jemetric Nicholson (or "Meechie") who was believed to have information regarding the murder, as well as the gun found at the home. (*Rapacz's Statement of Facts*, ¶ 70-71). Officer Rapacz also says plaintiff said he knew about the gun and admitted "handl[ing]" it. (*Rapacz's Statement of Facts*, ¶ 71). According to plaintiff, however, he was never asked about the gun. (*Plaintiff's Statement of Facts*, ¶ 28). Eventually, the two officers took plaintiff to a holding cell. Officer Rapacz claims that's the last he saw of plaintiff. (*Rapacz's Statement of Facts*, ¶ 73).

Plaintiff states that he was only in the cell for about an hour until they resumed their questioning in the interrogation room. Again, nothing was said about the gun. Then it was back to the holding cell until the next day, (*Plaintiff's Statement of Facts*, ¶ 29), when the shuttling back and forth and the homicide interrogation began all over again. (*Plaintiff's Statement of Facts*, ¶ 30). An Assistant States Attorney was present for some of the questioning (*Plaintiff's Response to Rapacz's Statement of Facts*, ¶¶ 75-76), although Officer Rapacz says he never consulted with one. (*Rapacz's Statement of Facts*, ¶ 63). October 12th began the same way. (*Plaintiff's Statement of Facts*, ¶ 31).

After some further questioning on the 12th, plaintiff was taken before a grand jury to testify about the Metra police officer murder. (*Plaintiff's Statement of Facts*, ¶ 32). Then he was processed and taken to the Markham courthouse for a bond hearing. (*Plaintiff's Statement of Facts*, ¶ 33). The charges filed against plaintiff – felony possession of a firearm – were eventually dismissed, after the

8

criminal court suppressed the gun as evidence, finding the police officers' testimony "too coincidental." (*Plaintiff's Statement of Facts*, ¶ 40).

## II.
## ANALYSIS

### A.
### Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the nonmoving party's evidence "'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Credibility determination must be left for the fact-finder. *Id.* at 552.

But this favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir. 2008). The nonmoving party "must do more than raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Board of Trustees of Purdue University,* 458 F.3d 620, 628 (7th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Where the nonmoving party bears the burden of proof at trial, he must present specific facts showing a genuine issue to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996)("If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."). A genuine issue of material fact exists, precluding

summary judgment, "only if sufficient evidence favoring the nonmoving party exists to permit a jury

to return a verdict for that party." *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir. 2007).

**B.**
**Officer Knapp Has Failed To Demonstrate That There Are No Issues Of Material Fact**
**And That He Is Entitled to Judgment As A Matter Of Law On The Claim That He Is**
**Personally Responsible For Plaintiff's Arrest**

Officer Knapp is named as a defendant on plaintiff's §1983 and common law claims of false

arrest.  Officer Knapp's motion for summary judgment is based entirely on the argument that he

wasn't there the day plaintiff was arrested, he didn't direct that he be arrested, the task force visits

to the home on October 9th and on October 10th were two separate and distinct events,  and that once

he found the gun and logged it into evidence he had nothing to do with what happened thereafter.

But the motion cannot really divorce his recovery of the weapon from the arrest on a weapons charge

so easily.

While as Officer Knapp submits, *Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001) held

that in order "to be held individually liable [in a §1983 case], a defendant must be 'personally

responsible for the deprivation of a constitutional right.'"  266 F.3d at 740.  But this general

proposition does not decide the case, for the language of an opinion must be understood in the

context of its utterance.  *See Penry v. Lynaugh*, 492 U.S. 302, 358 (1989)(Scalia, J., concurring and

dissenting in part);*Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005)(Posner, J.) ("Judges expect

their pronunciamentos to be read in context. . . .").  *Sanville* and the case it relied upon, *Chavez v.*

*Ill. State Police*, 251 F.3d 612, 651 (7th Cir.2001), were both rejecting a *respondiat superior* theory

of liability.  Both cases, therefore tailored their discussion toward what it would take for a supervisor

to be held liable for a subordinate's constitutional violation.  Here, however, plaintiff is not

advancing a *respondiat superior* theory to hold Officer Knapp responsible for the arrest.

Moreover, personal responsibility is not as narrowly defined as Officer Knapp's brief suggests. An official causes a constitutional violation if he "sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Brokaw v. Mercer County*, 235 F.3d 1000, 1012 (7th Cir. 2000). Put another way, "to be personally responsible for someone else's conduct, the defendant must have known about the conduct and either facilitated, endorsed, or deliberately ignored it." *Johnson v. Snyder*, 444 F.3d 579, 583-84 (7th Cir. 2006). So Officer Knapp "would have had to have undertaken some action prior to" plaintiff's arrest "in order to have 'caused' or 'participated in' it." *Jenkins v. Keating*, 147 F.3d 577, 583-84 (7th Cir. 1998).

The plaintiff states his case this way: Officer Knapp came up with the gun – which wasn't plaintiff's and wasn't even in plaintiff's room – and coupled it with plaintiff's ID and tickets, and *that* led directly to plaintiff's arrest. Phrased differently, Officer Knapp "set in motion a series of events" that led to the arrest. *Brokaw*, 235 F.3d at 1012. He "facilitated "the arrest. *Johnson*, 444 F.3d at 583-84. If there was no weapon on top of the ID and tickets, no felony weapons charge would or should have been brought.

Any probable cause for the plaintiff's arrest – and the state court found there wasn't any[2] –

---

[2] This issue seems to come up most often in cases where the plaintiff was arrested, and the state court found there *was* probable cause for the arrest. In such instances, the probable cause finding controls in the plaintiff's federal case under the doctrine of collateral estoppel if plaintiff is questioning the *sufficiency* of the evidence. *Brokaw*, 305 F.3d at 670; *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989. But collateral estoppel does not apply if the plaintiff is questioning the *integrity* of the evidence, as the plaintiff is here. *Brokaw*, 305 F.3d at 670; *Schertz*, 875 F.2d at 582. Moreover, the plaintiff in this case does not even have such a hurdle because the state court did not credit the officers' testimony about finding the gun with all but a name tag attached to it.

would have stemmed exclusively from the evidence Officer Knapp produced. Contrary to the position Officer Knapp is espousing here, if the probable cause supporting the arrest is based on Officer Knapp's "intentional misrepresentation or concealment of material facts, the plaintiff may be able to proceed on a Fourth Amendment claim challenging the reasonableness of the arrest." *Brokaw v. Weaver*, 305 F.3d 660, 670 (7th Cir. 2002). As "a matter of elementary principles of legal causation that are as applicable to constitutional torts as to common law torts," *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988), if Officer Knapp "caused" the arrest, he may be found liable.

In *Acevedo v. Canterbury,* 457 F.3d 721, 723 (7th Cir. 2006), the district court granted summary judgment for the defendant police officer, reasoning that he could not be held liable for the challenged arrest because he did not make the arrest himself. But the officer signed the criminal complaint, and the Seventh Circuit held that a police officer who files a false report may be liable for false arrest if the filing of the report leads to a seizure in violation of the Fourth Amendment, even if he did not participate in the actual arrest. *Id.* at 723. Here, Officer Knapp uncovered and logged the only evidence to support plaintiff's arrest and made an oral report. The analysis – and the causal link between Officer Knapp and the arrest – is not meaningfully different here than it was in *Acevedo*.

It does not matter, then, that Officer Knapp was not present at plaintiff's arrest (*Memorandum of Law of Defendant James Knapp*, at 1-2); that he didn't direct any other officers to arrest plaintiff (*Id.*, at 2-3, 6); that the Task Force officers visited the house on two separate days (*Id.*, at 4, 7); or that plaintiff is seeking redress for his arrest and not the search of the house. (*Id.*, at 5). Plaintiff's claim is that Officer Knapp "manufactured" the only evidence supporting plaintiff's arrest. Officer

12

Knapp has a very different story, and it is that very conflict that cannot be resolved on summary judgment. Only a trial can resolve the credibility issues that pervade the case. *See Hunt*, 526 U.S. at 552; *Freeland v. Enodis Corp.*, 540 F.3d 721, 738 (7th Cir. 2008). The posture of the case is as it was in *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000), where the court said: "In essence, what we have here is a credibility question. If the officers' version of the events is true, [plaintiff] was not mistreated. If the claims in [plaintiff]'s lonely affidavit, however, are true, he has a case." *Id.* at 495.

Officer Knapp's only argument in support of summary judgment is that he did not physically participate in the arrest, and that the events of the day of the search are somehow disconnected from the apprehension of the plaintiff the following day. But that takes too narrow a view of the case because under the plaintiff's version of events, the search led inevitably to the arrest 24 hours later. There is enough in the record to raise a genuine issue of material fact as to whether Officer Knapp set in motion the events that led to the arrest so that he can be considered personally responsible. Accordingly, his motion for summary judgment must be denied.

## C.
### The Claims Against Officer Rapacz

Officer Rapacz, who is named as a defendant in all counts of the complaint, argues he is entitled to summary judgment on the §1983 and common law false arrest claims because plaintiff's arrest was supported by probable cause. He also asks for summary judgment on the §1983 false arrest claim based on qualified immunity. He argues that he is entitled to summary judgment on plaintiff's §1983 unlawful confinement and common law malicious prosecution claims because he played no role in plaintiff's detention or prosecution.

Like Officer Knapp, Officer Rapacz seeks to distance himself from the arrest. He was at the

13

front of the house while his fellow officers elicited – or didn't elicit – Herman, Sr.'s consent to search the house. He entered through the front of the house when he was told consent was secured. He did not actively participate in the search, but remained in the living room while his colleagues searched the rest of the house. That is where he was when Officer Knapp shouted that he had found a gun. He says that he did not see Officer Knapp retrieve the gun from the bedroom (as Knapp claimed), and there is no evidence to the contrary. The first he saw of the gun was when Officers Knapp and Daley brought it out to the living room and explained it had been found along with the ID and the citations stuck under a mattress.

The next day, Officer Rapacz was sent to arrest plaintiff on felony weapons charges: plaintiff was on parole and, seemingly, in possession of a handgun with a defaced serial number. As Officer Rapacz tells it, he was about as involved in the arrest as he had been in the search. He stayed at the front of the house. He didn't chase plaintiff or attempt to apprehend him. He says that was taken care of by a Hazel Crest police officer, who then turned plaintiff over to Officers Rapacz and Daley. Plaintiff maintains that no Hazel Crest officers were involved, only Task Force officers, but isn't specific about Officer Rapacz's involvement. But Officers Rapacz and Daley did take plaintiff to the police station in Riverdale, questioned him and placed him in a holding cell. According to Officer Rapacz, that's the last contact he had with plaintiff. Plaintiff says he was repeatedly questioned over the next couple of days, and that Officer Rapacz participated in that questioning on October 11th and 12th.

## 1.

### Officer Rapacz Reasonably Believed He Had Probable Cause To Arrest Plaintiff And Is Entitled To Qualified Immunity On The §1983 False Arrest Claim

Probable cause is an absolute defense to a claim of wrongful arrest asserted under section

1983 against a police officer. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008); *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). A police officer has probable cause to arrest "if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' "*Wagner v. Washington County,* 493 F.3d 833, 836 (7th Cir. 2007). Thus, probable cause "'does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.'" *Wheeler*, 539 F.3d at 634.

In determining whether an officer had probable cause, his actions must be assessed from the perspective of a reasonable person in his position, *Wheeler*, 539 F.3d at 634; *Mustafa v. City of Chicago,* 442 F.3d 544, 547 (7th Cir. 2006), not "on the facts as an omniscient observer would perceive them . . . ." *Mustafa*, 442 F.3d at 547. They must, instead, be assessed in light of what that officer knew at the time. *Shipman v. Hamilton*, 520 F.3d 775, 778 (7th Cir. 2008); *Payne v. Pauley,* 337 F.3d 767, 776 (7th Cir. 2003). It doesn't matter what actually proved to have been true later on or if the officer should have known more. *Shipman*, 520 F.3d at 778; *Washington v. Haupert*, 481 F.3d 543, 547 (7th Cir. 2007).

Whatever Officer Knapp may have done during his search – planted the gun, deliberately coupled it with plaintiff's ID, or fortuitously found the items all together as he claimed – there is no evidence that Officer Rapacz knew about it. All he knew was that the gun was found with plaintiff's ID and citations, and that plaintiff was a convicted felon on parole. So it might seem that cases like *Mustafa* and *Payne* and *Shipman* would apply, and that Officer Rapacz would be found to have acted with probable cause. But it's not so simple as that. This is a fork in the road; in one direction the

probable cause analysis continues, while in the other, the qualified immunity analysis begins.

In the probable cause analysis, it is not necessary that the police officer who actually makes the arrest personally know all the facts that constitute probable cause if he is reasonably acting at the direction of another officer or police agency. *United States v. Parra,* 402 F.3d 752, 764 (7th Cir. 2005); *United States v. Randall*, 947 F.2d 1314, 1319 (7th Cir. 1991). This is known as the "collective knowledge doctrine" and it is rooted in practicalities. These situations are fluid; as the Supreme Court explained in *United States v. Hensley,* 469 U.S. 221 (1985): "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.* at 231. Courts apply the doctrine in situations like the one here: "when officers are in communication with each other while working together at a scene . . . even when there is no express testimony that the specific or detailed information creating the justification for a[n] [arrest] was conveyed . . . ." *Parra*, 402 U.S. at 764.

But there's a sticking point; one that undermines the general statements from cases like *Mustafa* and *Payne* and *Shipman* that probable cause depends only on what the arresting officer knows whether ultimately true or not. In these types of "common knowledge" circumstances, the arrest is proper only if the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause. *Parra*, 402 F.3d at 764; *Randall*, *supra.* Here, for the purposes of summary judgment, it wasn't. Whether there was informed consent to the search of the house or not, who knows where Officer Knapp actually came up with the gun, the ID, and the tickets? As discussed earlier, there are credibility issues inherent

16

in the resolution of just what Officer Knapp did during his search. Because Officer Knapp's actions are disputed by the plaintiff, it cannot be said, on summary judgment, that Officer Rapacz's arrest of plaintiff was supported by probable cause. *See Duran v. Sirgedas*, 240 Fed.Appx. 104, 115, 2007 WL 1259059, *8 (7th Cir. 2007)(factual dispute regarding information known to officer directing arrest prevents determination whether probable cause supported second officer's actions).

But that does not end things, because it still leaves open the option of qualified immunity. The doctrine of qualified immunity shields from liability public officials, like police officers, who perform discretionary duties. *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008); *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir.2007). Police officers, as already suggested, are often called upon to make difficult decisions very quickly and in dangerous situations; inevitably, some of those decisions will be mistaken. *Jewett*, 521 F.3d at 822. Qualified immunity applies to protect officers from liability "if 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)(quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter*, 502 U.S. at 227(quoting *Anderson*, 483 U.S. at 641). The doctrine strikes a balance between two conflicting concerns:

> Subjecting police officers to liability for each reasonable but ultimately mistaken decision would result in "unwarranted timidity," would deter talented candidates from becoming police officers and would result in lawsuits that distract officers from their duties. At the same time, there remains a need to vindicate constitutional violations by government officials who abuse their offices. . . . [T]he doctrine of qualified immunity . . . shields from liability police officers who act in ways they reasonably believe to be lawful.

*Jewett*, 521 F.3d at 822 (citations omitted).

The analysis is a matter of determining whether Officer Rapacz could reasonably rely on Officer Knapp's word, no matter how flawed or contrived it may have been. Courts call this "arguable probable cause," and it entitles the officer to qualified immunity. *Williams v. Jaglowski*, 269 F.3d 778, 781-82 (7th Cir. 2001); *Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999); *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir.1998). For all Officer Rapacz knew, Officer Knapp found the gun along with the ID and tickets just as he said he did. Given that information, along with the fact that plaintiff was a convicted felon on parole, Officer Rapacz reasonably believed he had probable cause to arrest the plaintiff for violation of either or both of 720 ILCS 5/24-1.1(a) or 730 ILCS 5/3-3-7(a)(1)-(2).[3]

The plaintiff's arguments against the application of qualified immunity here are unconvincing. While qualified immunity is an affirmative defense, once it is raised, it becomes the plaintiff's burden to defeat it. *Jewett*, 521 F.3d at 823; *Mannoia v. Farrow,* 476 F.3d 453, 457 (7th

---

[3] 720 ILCS 5/24-1.1(a) provides:

> (a) It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction. This Section shall not apply if the person has been granted relief by the Director of the Department of State Police under Section 10 of the Firearm Owners Identification Card Act.

730 ILCS 5/3-3-7(a)(1)-(2) provides:

> (a) The conditions of parole or mandatory supervised release shall be such as the Prisoner Review Board deems necessary to assist the subject in leading a law-abiding life. The conditions of every parole and mandatory supervised release are that the subject:

> (1) not violate any criminal statute of any jurisdiction during the parole or release term;

> (2) refrain from possessing a firearm or other dangerous weapon[.]

Cir. 2007). The plaintiff relies on *Rogers v. Powell*, 120 F.3d 446 (3rd Cir. 1997). There, the court

considered whether two arresting officers enjoyed qualified immunity from an unlawful arrest claim.

In the case of the first officer, he directed the arrest based on the following evidence:

> Prior to starting his shift, Edwards claims that he had spoken with Trooper Davy.
> During this conversation, Davy allegedly mentioned that there was a "court paper out
> on Rogers." The record, however, is devoid of any declaration or deposition by Davy,
> so we cannot confirm exactly what he said to Edwards.

*Rogers*, 120 F.3d at 449-50. Noting that this was "thin soup" to go on, the court held that it was not

objectively reasonable for the first officer to rely on this unclear statement without further

confirmation. 120 F.3d at 455-56. For the second officer, he relied on a statement from the first that

he should arrest the plaintiff as there was a summary warrant out on him. 120 F.3d at 450-51. This

was not vague at all, and the court found that the second officer reasonably relied on it and was

entitled to qualified immunity. 120 F.3d at 456.

Like the second officer in *Rogers*, Officer Rapacz wasn't relying on some nebulous snippet

of conversation when he arrested plaintiff. He was acting on Officer Knapp's clear and

unambiguous representation that he had found a gun sticking out from a mattress along with

plaintiff's ID and citations issued to him. Plaintiff argues that Officer Rapacz ought to have

questioned such a convenient find, and it was not reasonable for him to rely on Officer Knapp's

representation without further investigation. It seems plaintiff's position is that officers in this

situation must cross-examine there fellow officers, or make credibility determinations based on some

nebulous standard. The Supreme Court has charted a different course. *See Hensley*, 469 U.S. at 232.

After all, since police officers enjoy qualified immunity whenever they reasonably rely upon

information provided by ordinary citizens, or public servants such as emergency medical personnel,

or security guards, it would be odd if they could not reasonably rely on information from a fellow officer. *Spiegel v. Cortese*, 196 F.3d 717, 726 (7th Cir. 1999). Accordingly, Officer Rapacz is entitled to qualified immunity, and summary judgment, on plaintiff's §1983 false arrest claim.[4]

## 2.
### Officer Rapacz Is Entitled To Summary Judgment On Plaintiff's Malicious Prosecution Claim

Officer Rapacz argues that summary judgment is proper on plaintiff's malicious prosecution claim because once he arrested and interrogated plaintiff, he played no role in plaintiff's prosecution. Plaintiff contends that Officer Rapacz "played a significant role in causing the prosecution of the plaintiff," *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill.App.3d 340, 348-49, 733 N.E.2d 835, 84 (1st Dist. 2000), in that he interrogated him, proofread a report regarding the events leading to the arrest, and was in contact with the state's attorney. (*Plaintiff's Response to Defendants' Motion for Summary Judgment*, at 17). But actions for malicious prosecution are generally disfavored, *Aguirre v. City of Chicago*, 382 Ill.App.3d 89, 96, 887 N.E.2d 656, 662 (1 Dist. 2008); *Rodgers,* 315 Ill.App.3d at 345, 733 N.E.2d at 840, and bringing one against a police officer is anomalous. *Albright v. Oliver*, 510 U.S. 266, 279 n.5 (1994)(Ginsburg, J., concurring); *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996). Police officers don't prosecute, prosecutors do. *Reed,* 77 F.3d at 1053.

---

[4] Officer Rapacz's qualified immunity applies to shield him only from plaintiff's federal false arrest claim, brought under §1983. *Magdziak v. Byrd*, 96 F.3d 1045, 1048 (7th Cir. 1996); *Benning v. Bd. of Regents of Regency Universities,* 928 F.2d 775, 778-79 (7th Cir.1991). As such, the common law false arrest claim remains standing. Officer Rapacz makes no argument as to plaintiff's common law false imprisonment claim, other than submitting that the arrest was supported by probable cause. As that cannot be determined on summary judgment, that claim remains as well. Moreover, under Illinois law, even if the original arrest and detention were lawful, the subsequent imprisonment may not be. *Fulford v. O'Connor*, 3 Ill.2d 490, 500, 121 N.E.2d 767,773 (1954); *Sassali v. DeFauw*, 297 Ill.App.3d 50, 52, 696 N.E.2d 1217, 1219 (2nd Dist. 1998); *Weimann v. Kane County*, 150 Ill.App.3d 962, 968, 502 N.E.2d 373, 376 (2nd Dist. 1986).

There are circumstances where a police officer can be found to have played a significant role in a prosecution, but this was not one of them. A plaintiff who demonstrates only that he was arrested and detained without probable cause has not made out a claim for malicious prosecution. *Sneed v. Rybicki*, 146 F.3d 478, 481 (7th Cir. 1998); *Reed*, 77 F.3d at 1053. Plaintiff arguably comes forward with a bit more than that here, but not much more and certainly not enough. Proofreading an arrest report doesn't qualify – that's just the paperwork, part and parcel to participating in the arrest. Interrogating the plaintiff doesn't qualify either. *Sneed*, 146 F.3d at 481 (interrogation, perhaps even coercion of a confession, did not constitute malicious prosecution). Nor does contact with the state's attorney even as a witness, *Reed*, 77 F.3d at 1053, unless the police officer committed some act of misconduct along the lines of giving perjured testimony, or falsifying information or evidence, or withholding exculpatory evidence. *Sneed*, 146 F.3d at 481; *Reed*, 77 F.3d at 1053. There being nothing like that in the record here, Officer Rapacz is entitled to summary judgment on this claim.

### 3.
### Officer Rapacz Has Failed To Demonstrate He Is Entitled To Summary Judgment on Plaintiff's Unlawful Duration of Confinement Claim

That leaves plaintiff's unlawful duration of confinement claim. The law requires a "prompt" judicial determination of probable cause after a person is taken into custody. *Gerstein v. Pugh,* 420 U.S. 103, 114 (1975). As a general rule, "prompt" has been taken to mean within 48 hours. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). Police may postpone a *Gerstein* hearing for a reasonable amount of time in order to "cope with the everyday problems of processing suspects through an overly burdened criminal justice system." *McLaughlin*, 500 U.S. at 55. While a "judicial determination of probable cause within 48 hours of arrest will, as a general matter, comply with the

promptness requirement of *Gerstein*," a lesser delay might still be unconstitutional "if the arrested individual can prove that his or her probable cause determination was delayed unreasonably." *McLaughlin*, 500 U.S. at 56. If the delay extends beyond 48 hours, however, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance" to justify the delay. *McLaughlin.* 500 U.S. at 57. Here, the plaintiff was not taken for a probable cause hearing until three days after his arrest, well past the 48-hour mark. This, despite the fact that *Gerstein* hearings were held in the local courthouse seven days a week.

Officer Rapacz's supporting memorandum barely mentions plaintiff's unlawful duration of confinement claim. It says only that he "played no role in charging or prosecuting plaintiff and cannot be liable for malicious prosecution or failure to arrange a prompt hearing for plaintiff. . . . There is no evidence he took any action, muchless [sic] an improper one, with respect to plaintiff's continued detention . . . ." (*Memorandum in Support of Officer Rapacz's Motion for Summary Judgment*, at 23). This assertion is otherwise undeveloped and unsupported by any case law. Consequently, it is subject to the Seventh Circuit's oft-repeated admonition that ". . . it is not the province of the courts to complete litigants' thoughts for them, and we will not address this undeveloped argument." *White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 476 n.6 (7th Cir. 2009). *See also Argyropoulos v. City of Alton*, 539 F.3d 724, 739 (7th Cir. 2008); *United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991). Moreover, it is no answer to say that the defendant is not liable for the delay in getting plaintiff to a probable cause hearing because "[t]here is no evidence he took any action." That is precisely the core of the plaintiff's contention: the defendant should have taken some action but did not.

Officer Rapacz's reply brief seeks to justify the officer's inaction on the ground that as a

parolee, the plaintiff "legally remained in the custody of the state," and thus cannot show any harm

resulting from the delay. (*Officer Rapacz's Reply*, at 11, 12). Although there's a bit more to these

contentions in the reply brief than the assertions in Officer Rapacz's opening brief, they are still little

more than the germs of ideas and are completely unsupported. *See Woolard v. Woolard*, 547 F.3d

755, 760 (7th Cir. 2008); *United States v. Stevens*, 500 F.3d 625, 628-29 (7th Cir.2007); *Ner Tamid

Congregation of North Town v. Krivoruchko*, 620 F.Supp.2d 924, 928 (N.D.Ill. 2009). The reply

brief fails to suggest whose duty it might have been, and indeed tacitly suggests that no one had that

duty since as a parolee, the plaintiff was already in custody.

Generally, "state law . . . determine[s] who is responsible for ensuring that a judicial

determination of probable cause is made within 48 hours after an arrest." *Cherrington v. Skeeter,* 344

F.3d 631, 644 (6th Cir. 2003). The reply brief points to no statute, case, or police department rule

or regulation from which it can be determined either that Office Rapacz was not responsible or that

someone else was responsible to assure that the plaintiff had a timely probable cause hearing.

Perhaps it was Officer Rapacz's responsibility; or perhaps it was Daley's, or maybe both. But as

things now stand, summary judgment is inappropriate.

The contention in the reply brief that the plaintiff's status as a parolee relieved Officer

Rapacz of any obligation to take plaintiff to a *Gerstein* hearing is manifestly wrong. The argument

rests on the following premise: as a parolee, the plaintiff was deemed to be *technically* in state

custody and therefore could suffer no harm no matter how long he was confined without a probable

cause hearing. "'The soundness of a conclusion may not infrequently be tested by its

consequences.'" Posner, Cardozo: A Study in Reputation, 118 (1990). *See also Florida Power &

Light Co. v. Lorion*, 470 U.S. 729, 741 (1985)("An examination of the consequences that would

follow upon adoption of the contrary rule proposed by the Court of Appeals in these cases confirms the soundness of this conclusion"). The argument rests on a fiction of state law, having nothing to do with the Constitution or federal law or the reasons that a *Gerstein* hearing is required. If the defendant's argument were accepted, it would mean that no parolee had the right secured by the Fourth Amendment and *Gerstein* and *McLaughlin*. Once arrested, a parolee could be locked up indefinitely without a judicial determination as to whether probable cause supported his arrest, because, under Illinois law he would be deemed for certain purposes to be "in custody." What Justice Holmes said in perhaps the most famous law review article ever written, applies perfectly here: "[w]e must think things, not words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true." *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 460 (1889).

*Gerstein* and *McLaughlin* were not concerned with "technical" custody of a parolee under state law; they were concerned with the harm that comes from actual, prolonged confinement in jail, *Gerstein*, 420 U.S. at 114, the consequences which "may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *McLaughlin*, 500 U.S. at 58. While a parolee may be deemed under state law to be in custody for certain purposes, the reality – and realities must dominate judgment, *DiSanto v. Pennsylvania*, 273 U.S. 34, 43 (1927); *Schmidt v. Ottawa Medical Center*, 322 F.3d 461, 464 (7th Cir. 2003) – is, that the plaintiff in this case was not, prior to his arrest, confined in jail and thus was not in custody under the Constitution or federal law.

Perhaps there is more to what Officer Rapacz is attempting to argue, but his briefs fail to provide it, and it would be improper for me to try and construct the argument for him. *See Fabriko*

24

*Acquisition Corporation v. Prokos* 536 F.3d 605, 609 (7th Cir. 2008); *Kay v. Board of Educ. of City of Chicago*, 547 F.3d 736, 738 (7th Cir. 2008)(cautioning judges to limit their consideration to the parties' briefs); *Hartmann v. Prudential Ins. Co. of America*, 9 F.3d 1207, 1214 (7th Cir. 1993)("Our system unlike that of the Continent is not geared to having judges take over the function of lawyers . . . .").

## CONCLUSION

The motion of Officer Knapp for summary judgment [# 66] is DENIED, and the motion of

defendant, Officer Rapacz, for summary judgment [#74] is GRANTED in part and DENIED in part.


ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 9/30/09